SHEFFIELD *v.* JOURNAL PUBLISHING CO.

Division B. Mar. 26, 1951.

No. 37896 (51 So. (2d) 479)

**C. B. Hutchinson** and **Clarence Chase,** for appellant.

**C. R. Bolton,** for appellee.

**Alexander, J.**

Appellant filed suit for libel against the publishers of the Tupelo Daily Journal for damages alleged to have been suffered by the publication of the following news story:

"Prentiss Sheriff 'Forced To Draw'

" 'Shoots it Out' With East Booneville Man

"Booneville—(Special)—Prentiss County Sheriff Sale Martin was called into a situation Thursday about noon where he found it necessary to assume the fearless role of a frontier marshal and shoot it out with a 'two-gun' Prentiss Countian.

"According to the sheriff, he received a telephone call from the Sheffield home in East Booneville, appealing for help and protection from W. H. (Red) Sheffield, who, the informer said, had threatened to shoot himself, members of the family, and the 'whole neighborhood.'

"Hurrying to the scene, Sheriff Martin said he was confronted within 100 yards of the Sheffield home by 'Red', armed with two guns, who began shooting. In an exchange of shots, Sheffield received a leg wound that enabled the men to disarm him, after which he was rushed to the Anderson Clinic, where Dr. W. H. Anderson treated the wound. Sheffield was then placed in jail.

"After consultation between Dr. Anderson and County Health Officer H. G. Waldrop, it was decided that the prisoner should be removed to a mental institution. Commitment papers were prepared and signed and Sheriff Martin with his deputy, J. W. L. Eaton, escorted the man to Whitfield Thursday afternoon. Sheffield is reported to be 38 years old."

From a verdict and judgment for appellee, this appeal is taken.

The following summary of the testimony will test the merit of the plea of justification and the general denial of damage and liability.

The father and mother of appellant reported to the sheriff that appellant was raising a disturbance and threatening with curses to kill members of the family and had run them from the house. They wanted an affidavit made so that he could be arrested and confined.

Answering the call, the sheriff with his deputy went to the scene. Appellant was found clad only in underclothes. Upon espying the officers he ran to the barn. In this connection plaintiff stated that in the barn he had stored a case of beer. The relevancy of this disclosure is not made clear, and he did not explain whether his seeking refuge was in the interest of himself or his stores or a mere coincidence. He conceded that he had been drinking and in fact he ''got up drinking that morning'' and had been drinking for two days. His version was ''I was drinking, not drunk.'' Tested as to his ability to be ''up and going'' he stated, ''I was going. I call a man drunk that can't walk without holding to something or staggering.'' Credence should be accorded to the last statement in view of the revelation that when arrested and provided with clothing he selected the moment of putting on his shoes for an agile and precipitous departure through a cotton patch. Three shots were fired by the sheriff into the air by way of publicizing his authority and admonishing recognition thereof. The only effect of this display was added acceleration hastening an early and complete disappearance into nearby woods. He later maneuvered his course so as again to attain the house where he changed his clothes and his tactics. The latter involved a seeking of sanctuary in the home of his uncle. From the latter vantage point he telephoned to his sister; the conversation being overcast with recrimination and ill concealed resentment. Thereupon it was heralded that the sheriff had persisted in the chase and was outside. Appellant urged the other

occupants to conceal the fact of his presence. When the sheriff approached the door, appellant emerged from a closet and grabbed a shotgun which, because of his impatient haste out of a rear door, was knocked from his hands and recovered by the officer.

From nearby woods he was heard cursing and breathing out threatenings against all participants in the scene. Gun shots were heard from this location but the appellant remained concealed. Later the officers stationed themselves in the barn and when appellant appeared, he "was cussing and saying he wasn't going and would die before he would go, and wringing his hands and slapping them." His threats continued. He was arrested after having been shot in the foot or leg by the sheriff. He was found to have several loaded shotgun shells of the same gauge as the gun he had dropped, which latter was found to have been recently shot and with smoke still in the barrel.

In his bedroom his breakfast was still set out on a table. There had been spread over it a small quantity of DDT, an insecticide, and other foreign substances. Also found were a letter allegedly written by him, and two shotguns. Members of his family took steps resulting in his removal to the State Insane Hospital from which after ten days' observation he was discharged.

In view of the contention that the publication was libelous per se and the adoption of such theory on instructions requested by appellant, we resume consideration of the printed article.

We have heretofore given support to the doctrine that ██ █ a publication is per se defamatory if it tends to injure another in his trade, business or profession. The appellant was a farmer. Therefore, the publication, to be of itself libelous, must be such as would tend to injure him in the business of farming. ██ █ While imputation of crime needs no innuendo to sustain its status as presumably libelous, a publication in the former category is not absolutely and of necessity defamatory.

In this connection the particular statements must be adjudged in the light of the particular business. The libel, therefore, may not be per se but ad hoc. Prosser, Torts, p. 802; A. L. I. Rest., Torts, Section 573. In view of the reasonable assumption that every adult male has some business, a contrary view would operate to make one absolutely liable for any statement which diminished the personal esteem in which another is held.

 We cannot lend assent to a contention that one designated as a "two gun man" or who is alleged to have "threatened to shoot himself, members of his family and the whole neighborhood", has been charged with a crime. This view is apart from a consideration of the truth of the statements.

Wherefore, we hold that actual damage must be shown. Although appellant was refused a charge that the language, if used, is actionable in and of itself, he was granted an instruction that the law implies in this case both malice and an intention to injure. We think the latter instruction went beyond the right of appellant and that the former was properly refused. Inconsistency with instructions granted the defendant is asserted and assigned for error. These instructions left the issue of malice and actual damage for the consideration of the jury. This was proper.

Other instructions were based on justification by truth and required, as a prerequisite to the assessment of damages, a finding of falsity in the report followed by actual injury. Where two instructions are inconsistent and only that given to the aggrieved party is improper, he may not predicate error upon such inconsistency.

 Error is assigned for the granting of charges to the defendant, appellee, which base immunity upon the good faith of the publisher. Contrary to an unjustified though rather popular conception, we have not assented to a doctrine which would shield a publisher behind a defense that a publication, defamatory per se, may be justified by a reliance in good faith "upon in-

formation from a reliable source.'' We do not declare affirmatively upon this point since the challenged instruction added conjunctively "and that such report (and publication) were substantially true.''

The following instruction, denounced by the appellant, is found quite in order: "The Court charges the jury that if they believe from the evidence such damages as plaintiff has suffered, if any, were caused by his own acts and conduct or from any other source and not by the publication made by defendant on July 15th, they will find their verdict for defendant.''

Other instructions limited a recovery to such damage as followed the publication of those parts of the printed article found to be untrue. This is in line with the authorities.

We find no reversible error in the record.
Affirmed.